The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Good morning, Your Honors, and may it please the Court. Congress has determined that disputes between labor unions and employers should be resolved between the parties through negotiation, not through injunctions. District courts therefore possess only the narrow jurisdiction necessary to ensure that an arbitrator retains the power to eventually satisfy a union's grievance. Even when a district court has that jurisdiction, it still may issue preliminary relief only if the union satisfies the familiar four-part test for the preliminary injunction on the merits. The district court here erred on both counts. First, it improperly expanded its narrow boys' markets jurisdiction to enjoin a planned move by Airgas that both sides agreed below was within the arbitrator's power to reverse. Second, it took its improper jurisdictional analysis and applied it at the four-part merits test for a preliminary injunction, essentially collapsing the merits and jurisdictional inquiries into one. Each error in the You collapse them, but in your view, they lead to the same place, that the injunction was impermissible. Oh, yes, Your Honor. We believe there are two distinct or several Well, maybe, but you both seem to be collapsing them. It's just that when you collapse them, you seem to come to different conclusions. Respectfully, Your Honor, we believe, I assume that you're speaking about both the boys' markets inquiry and irreparable harm inquiry, which are the closest analogs to each other in the case. Let me just ask you a factual question that I was interested in. When the company here transferred the work of Hyattsville facilities to the two other facilities, was it How many people were laid off in that? I just want to know factually how many folks were laid off. Of course, Your Honor. As a matter of fact, we weren't able to proceed with the transfer, so no one was coordinately laid off. But how many would have been? We believe that one would have been immediately, and there would have been an elimination of 13 positions. And so accordingly, whether or not further layoffs would have been necessary would have depended on, for example So one, we're talking about one? One immediate layoff, Your Honor, with an elimination of up to 13 positions later, which might have precipitated further layoffs depending on, for example, if we had other terminations for cause, when people came back from family medical leave, act leave, and so on. But one that you know of? Yes, Your Honor. It would have precipitated one immediate layoff, as well as, again, there would have been When you transferred the work, was that to reconstruct the facility so that you could use it as a storage facility for the nitrous oxide gas? Well, Your Honor, had we been permitted Was that the reason for it? That was one of several reasons, Your Honor. Was that one of several reasons? Yes, Your Honor. That would have been one of several reasons. Was that the subject of the DHS directive? Yes, Your Honor. We'd had a recent DHS audit that had informed us that we were required to secure several chemicals of concern under 6 CFR Part 21. What was the nature of the DHS directive? We were informed that we were required to additionally secure several chemicals. That would have required that we place them essentially inside either an independently locked room, a fully enclosed area, or So you had the chemical, but it was just not under sufficiently secure conditions? Put simply, yes, Your Honor. And the reconstruction was to put the chemical under a more secure condition? Your Honor, it actually wouldn't have been a reconstruction. So we have a small medical oxygen filling room, essentially, in our Hyatt School facility. And then we were going to take that function out and transfer it to Linthicum Heights, Maryland, which also performs the same kind of work, essentially as its exclusive purpose. And we planned on storing the chemicals there. So there wouldn't have been construction for repurposing this. Essentially, we were emptying out a security. The end purpose of the renovation, readjustment, or what have you, of the facility was to provide a more secure storage place for the chemicals? That was one of several reasons, including business efficiencies as well, Your Honor, yes. Okay, so there was a combination of reasons there? Yes, Your Honor. If you'd like, I'd be happy to go into those reasons, Fuller, if it would be more helpful for you, Your Honor. Okay. So there's not only ñ I'm sorry. I'm sorry. I'm just trying to get my hands around the facts as well. Why didn't Airgas agree to expedited arbitration? Well, Your Honor, we actually, as part of our collective bargaining agreement, have a particular method or a particular process for reaching an arbitration. We first have seven names provided by the Federal Management and Conciliatory Service, and then we take turns going back and forth, essentially striking arbitrators we find unacceptable. The remaining arbitrator is the one that's mutually acceptable to the parties, and that arbitrator, as a matter of fact, frequently doesn't have availability until several months down the road. So to give example, in this case, once we had actually arrived at our arbitrator, we contacted her in mid-March, March 15th, and inquired about her first available date, and that was mid-July, July 15th. So that was a single arbitrator? Yes, Your Honor. Had the arbitrator been selected at the time that you transferred the work? Yes, sir. Well, the grievance procedure that we have in the CBA provides this  I understand. Of course. At the time that you transferred the work and the union grieved it, and the arbitrator was selected. And how far along had the arbitration process gone? When we'd selected the arbitrator? When the arbitrator was selected. As I understand it, well, obviously the work was transferred first. Then came the union grievance. Then you moved that to arbitration, right? Well, we weren't actually able to effectuate the transfer, Your Honor, because of the injunction. Because of the injunction. Yes, Your Honor. What you wanted to do was move it along to arbitration. Had it gone toward arbitration at any point before the How far along had it gone toward arbitration before the injunction was entered? Essentially not at all, Your Honor. So our grievance procedure begins with essentially an informal conciliation procedure and then it escalates to a formal grievance, which if Airgas denies that grievance escalates further to an arbitration. I understand. And how much of that process had been completed before the injunction came down? We had denied the formal grievance, but we had not, for example, selected an arbitrator. Okay. So an arbitrator had been selected before the injunction came down. No, Your Honor. We had not selected an arbitrator by that point. How far along had the selection process gone? I'm not aware of that at the moment, Your Honor. But your point is that the collective bargaining process provided for it. Yes, Your Honor. It provided a very specific negotiated Was there any suggestion that you were not going to abide by the collective bargaining process that had been set forth in the agreement? Were you trying to get out of anything? Were you dragging your heels or what have you? Absolutely not, Your Honor. In fact, the only record evidence on this point was from Joel Young, who specifically stated that we would have fully complied with a favorable arbitral award in favor of the union. We had been, in fact, following the procedures provided for in the collective bargaining agreement for the adjudication, the escalation and eventual arbitration of a grievance by the union. So there's nothing in the record whatsoever, Your Honor, to suggest that Airgas would not have fully complied with either the arbitration or any other procedure that I've outlined here. I'm sorry. I just didn't understand your answer to my question. The district court says that Airgas refused to consider expedited arbitration. And I'm not saying you had to consider it, but given that the fact that the arbitration would not be expedited was important to the district court's factual finding that an arbitrator couldn't restore the status quo ante, I'm just curious as to why expedited arbitration was off the table for you. Of course, Your Honor. I'm very sorry for not answering your question. It's all right. I think maybe you tried, and I just didn't understand the answer. So in essence, the process by selecting the arbitrator itself is very important between the parties because, of course, both sides aren't going to necessarily going to find any given arbitrator except for Airgas. I totally understand that, but what does that have to do with – so are you saying there just really wasn't any way to move this? Not without abolishing the entire thing, Your Honor. The only process the CDA provides for selecting an arbitrator yielded an arbitrator that would have taken until July at the very earliest to actually provide to have the first arbitration setting. So we would have had to have essentially uprooted that. So you did know who your arbitrator would be? I thought you were saying you hadn't picked an arbitrator yet. I'm so confused. We hadn't, Your Honor. I'm sorry. I'm describing counterfactually what would have happened if we had agreed to expedite arbitration. Essentially, we would have had to have disregarded the entire arbitration process as laid out in CBA and then somehow come up with another method for determining expedited arbitration, which just as a matter of fact about these agreements – I guess the question that I have, was there any evidence that you were departing from the grievance and arbitration process as set forth in the collective bargaining agreement? None whatsoever, Your Honor. And to go back to your question, Judge Harris, there are in fact labor union contracts that provide for a specific expedited arbitration process that have someone, for example, where both the union and the employer can agree in advance, we will have an arbitrator either from this organization or a particular arbitrator essentially on call to give sort of the arbitration equivalent of a temporary restraining order or a very quick relief. Those do occur. They can be negotiated for at a collective bargaining agreement between an employer and a labor union. It simply wasn't negotiated for here, Your Honor, and to be able to sort of create one ad hoc out of nothing would have seriously disrupted the balance that the parties had struck in the collective bargaining agreement in the first place. I remember from my old American history class that the Norris LaGuardia Act, it was a famous piece of New Deal legislation, wasn't it? Yes, Your Honor. And it was, I remember very, very clearly that Franklin Roosevelt was portrayed as a great hero, and the New Deal was portrayed as a wonderful movement because it had gotten courts out of the business of jumping into the middle of labor disputes, and what had happened was that courts were just enjoining strikes rather than, you know, right and left. And so the Norris LaGuardia Act put restraining orders on the points and handcuffs on courts and said you can't enjoin this. And what's happened over time is that now it's come full circle, and they're back to enjoining things again. That's absolutely correct in some circumstances, Your Honor. First of all, what you describe regarding the underlying policies of the Norris LaGuardia Act are completely correct. Congress concluded that, in fact, district courts were much too rapid about intervening in labor disputes. You know, it was a great piece of progressive legislation and served well, but the underlying premise of it was that the grievance procedure, as outlined in the collective bargaining agreements, and that management and labor should be able, in particular through arbitration, which is labor arbitration has been a wonderful mechanism for industrial peace because normally unions will give up a right to strike in return for binding arbitration that management agrees to respect. Yes, Your Honor. That's one of the critical. And so that's the quid pro quo here, and the collective bargaining agreement sets forth this process, and the underlying assumption of it is that the parties should be free to resolve grievances between themselves without the courts jumping into it all. I agree with everything you said, Your Honor. I would only add one additional point, that the fundamental aim of American labor policy is to permit the parties between the union and employer to negotiate these questions freely, not only the fact that they will negotiate, as is fairly common today, giving up the right to strike in exchange for an employer submitting grievances to an independent third party arbitrator, but also the procedures under which they'll do so. And so Airgas and the union here negotiated for a particular, fairly finely reticulated series of procedures and remedies that an arbitrator would be able to provide. But they bargained for. Exactly, Your Honor. And to fault Airgas for failing essentially on, after the fact to ad hoc in the light of the district court's commentary, to abandon that arbitration provision for a one-off in favor of an expedited arbitration is essentially failing Airgas for not negotiating different terms in its arbitration provision in the first place, which is not only contrary to the fundamental policies that Your Honor points out in the Norris-LaGuardia Act, but also in federal labor law in general. Can I ask you a question about the likelihood of success on the merits factor? Please, Your Honor. So is it, to what extent, if any, is the idea that a federal court has to kind of take a little peek at the dispute to find a likelihood of success sufficient to justify one of these injunctions? I think, in fact, you just idiomatically put it quite well, Your Honor. This Court has described in Akers and in Liver Brothers that the court has to essentially take a, to ensure there's a genuine dispute, which is familiar terminology from the summary judgment context regarding facts, although it's a slightly strange fit, given that we're talking about a topic of law here, but that's only because of this particular case. To ensure that the union's position is sufficiently sound, that the arbitration essentially won't be a sham or a futile endeavor. So I would analogize it to the genuine dispute of material fact context for a jury. And you can envision a circumstance where our dispute here is essentially a pure question of law based on the meanings of Article 9 and 10. So that genuine dispute is going to rise to some sort of level of a threshold certainty, a threshold merit shown with the district court. But in many grievances, of course, there might be disputed questions of fact and then that threshold showing. Here in this particular contract, it's almost like Section 9 and Section 10. They pointed in opposite directions. And it seems to me just contractually to be a little bit of a standoff. I mean, one of them gives the union all kinds of rights and then the other one gives management all kinds of prerogatives. And, you know, that's why you have the grievance process. But it's a collective bargaining agreement in which there are several adjoining provisions that seem to face in different directions, which, you know, I'm glad I don't have to resolve that. Chief Judge, may I have leave to make two quick responses to that, Your Honor? Yeah, if they're responsive to a question. From what I'm understanding from you, Your Honor, I agree that there are in fact several different ways to interpret this. The District Court erred by not making a preliminary merits analysis of that as this Court's decisions in Akers and Lever Brothers make clear. Thank you very much. And I'd like to reserve the balance of my time for rebuttal, Your Honor. Absolutely. Thank you, Counsel. Mr. Murphy? Yes, Your Honor. May it please the Court, good morning. My name is Mark Murphy on behalf of Teamsters Local 639. I was the individual that participated in from the beginning of this dispute through the choosing of the arbitrator, through the arbitration process. So I'll take a few minutes just to answer the questions, particularly from Judge Harris and Judge Wilkerson. This dispute started to occur in late February of 2017. The company indicated to us they wanted to transfer two portions of their Hyattsville facility that are represented by the Teamsters, the 65 individuals that are represented. They wanted to transfer two portions of that facility to two separate non-union facilities that would represent a 20% diminishment of the bargaining unit. So 65 positions, 65 jobs, 13 would be eliminated. We, of course, said no, we don't agree with that. We have a provision in our contract, Article 10, that prohibits transfer of work. They turned around and said, as Judge Wilkerson noted, we have a provision in our contract that says Article 9 says management's rights. We can do that. There was a dispute. Tried to work it out. We couldn't work it out. We asked for them to do a couple of things. Agree to stay the transfer, hold it in abeyance, and expedite an arbitration so we could get a final decision on this. Mr. Stone is right. That's not in the contract. The contract doesn't have expedited arbitration. But, Judge Wilkerson, you should understand, based on your labor experience, the parties can agree to anything. If the parties wanted to agree to expedited arbitration, there's nothing that prevents them from doing that. What they did was they stood on their rights. Were they departing from the collective bargaining agreement in some way? No, Your Honor, they weren't. But the problem, and what the judge and lower court found was the problem with that is both sides recognized that it could take up to a year to go through the arbitration process. And that was one of the big problems the district court found and based the injunction on that. And, in fact, arbitrator was selected in March. Hearing was held in the end of September. Briefs, final post-hearing briefs were submitted in the end of November, and we're still waiting for a decision. All right, but the point is contractually you agreed to the grievance and arbitration process, and the company, sure, they could have renegotiated part of it or added a provision to the contract for expedition, but they weren't obliged to. And what they are obliged to do is when the arbitration decision comes down, they're obliged to follow it. Yes, Your Honor. So, you know, in the meantime, you know, if they want to do this, they're taking, you know, they're making a business judgment, they're taking a business risk, but it's probably a risk they're entitled to take as long as at the end of the road they abide by what the arbitrator says, assuming it draws its essence from the contract. Yes, Your Honor, but the problem here and what the district court recognized correctly is, as you said before, labor arbitration is a means for industrial labor peace, and that's excellent. But the question that the court needs to look at, and the district court did look at, is can an arbitrator provide a remedy? Can they put the parties back to the status quo ante? If they can't, that's when there's an exception to the Norris LaGuardia Act, and that's what happened here. I don't know why they couldn't provide the remedy. I mean, one thing, there's all kinds of make whole relief here in the terms of you can reinstate somebody or you can provide them for lost wages, but you can rehire them, you can provide them for lost wages, you can, as far as I know, you can put some of the equipment that was moved on the truck and head it back to Hyattsville. But I'm just not convinced that the arbitrator wouldn't have the remedial tools and the company's got to abide by it. They don't have a choice. That's a rule of law. Right, Judge Wilkins. The problem here and what the lower court recognized was it was a combination of the time that went by. This wasn't not just about putting people back to work. This was not just about layoffs. This was not just about reinstatement. It's about the time that's going to go by. We've already been at eight months. It could very well be a year before we get a decision. What happened in the interim? Isn't the passage of time, I mean, that would be assumed when you negotiated the grievance process because obviously every grievance process does take time. Yes, Your Honor, but in this case, this situation. It would be something that the negotiating parties would have taken into account. Sure, but this situation is not the situation that I think you're thinking of, which is an individual gets terminated under the contract. No, no, no. A grievance is filed. What troubles me here is, you know, this is one-fifth of the total work that was from the Hyattsville facility. Right. We're talking about at most 13. Twenty percent of the work, yes. Out of 65, okay? Right. Those positions were going to be gone, and that was the problem that the judge. Yes, but hold on a minute. Sure. I mean, I think what concerns me most here is that injunctions might become de rigueur while arbitration proceedings and the grievance process is ongoing, and I don't think that that's what Norris LaGuardia ever contemplated or that the collective bargaining agreement ever contemplated was this kind of court interference, either on the management or the labor side. You know, I have to say the Norris LaGuardia Act was not very flattering to courts. That Congress that passed that Norris LaGuardia Act didn't trust courts to act impartially. They thought, well, no, they're going to have a pro-labor agenda or they're going to have a pro-management agenda, and we don't want them jumping into it. We want this thing negotiated through the collective bargaining agreement, and we want the parties to resolve it in the way that they have agreed to do so. But what is advocated here is a complete suspension of a company's right to exercise its business judgment, even in a relatively minor way during the course of the arbitration process, and I don't see that that's negotiated for. It can't be that a company's business judgment in every particular is suspended during this grievance arbitration process, and if you suspend it here on something like this, it comes pretty close to being a per se rule because they're not closing down a plant. I mean, there's so many other things that could have been taken. They're not selling off equipment. They're not closing plants. It's a relatively minor thing, and part of it has to do with finding more secure storage facilities for this nitrous oxide gas. Sure, but to that point, to that last point, there was no directive. There was no deadline, and the court, the district court recognized that, and to your point with respect to this being de rigueur and kind of going against Norris LaGuardia, that's not the case at all, Your Honor. We have cases from this circuit, Akers and Lever Brothers, that discuss the standard. The standard is, is the arbitration process rendered hollow formality? The district court found that it was because of these things, the passage of time. We were already gone eight months. It wasn't just that someone got terminated or someone got laid off. Things were happening, and the district court recognized that. It was a very realistic, astute understanding of what was going on here. The company wasn't just putting something in storage. They were doing two things that the lower court recognized was a problem. They were repurposing the Hyattsville facility. They were changing that into a storage facility to satisfy DHS. Why wouldn't an arbitral remedy address all that? Your Honor, by the time the arbitral remedy comes, it's going to be established. They're not going to just be able to say, you 13 people, come back here. Sorry, we don't have room for you anymore. I don't know whether it's established or not, but there are all kinds of situations where monetary relief or injunctive relief or one thing or another can be awarded. That's the problem the district court found, though, was that monetary relief wasn't enough because the positions would be gone. They would be permanently gone, and the facility that was moved to, they were already hiring. Why isn't that an argument before the arbitrator? Mr. Judge Olkerson, the arbitrator had to deal with what you recognize was a very real problem, which is Article 9 of the contract versus Article 10 of the contract. We could argue that. We could argue that very point to the arbitrator. The arbitrator doesn't have any authority to tell the company, stop transferring the work. That's what the court has the authority to do. Maybe the arbitrator finds that Article 10 really gives management prerogatives over Article 9. I don't know which is which. Sure, and that's the question. That's the very question. The arbitrator could find that the management acted with complete correctness here, and if management feels confident enough in its political position and confident enough to make a business judgment during this interim period, I just don't understand what impediment in law there should be to doing that. It doesn't seem to me that the collective bargaining agreement just suspends a large business or a small business from making even small business decisions in the interest of efficiency or complying with federal regulatory directives. Yes, Judge. It's not the collective bargaining agreement. It's federal law, and the district court recognized that, and the district court applied the law to the facts of this case, and it was a very specific fact-based case. The district court looked and said, what's going to happen? Can an arbitrator put these parties back to where they were before the work transfer happened? And what the district court said very clearly was, no, that can't happen, because once a year goes by, the repurposed facility is a repurposed facility. There are 13 people or the 13 positions. It could be 13 other people, but there's not going to be any room for them at that facility. And then in the non-union operation in Montgomeryville. That sounds like you're jumping right into the middle of a labor dispute. Well, it's not, because you don't, and that's a very good question, but you know what? He didn't do that. He didn't put his thumb on the scale of Article 9 versus Article 10. The district court was looking at an exception to the Norris LaGuardia Act, correct? Right. Yes. That's a matter of law. There's an exception. If Congress didn't want an exception, there wouldn't have been one. So the district court was looking at the facts and circumstances to determine whether or not there would be irreparable harm and arbitration could not put the parties back together. Right. I'm surprised nobody's talked about rehiring. What about a man or a woman feeding their family for a year? Yes, Your Honor. Can you put that back? Can you put that genie back in the bottle? The district court said, no, you can't, no circumstances, because there's no stand-down provision in the contract that says, once we have a grievance about transfers, everybody must stand down. There's no provision that does that. Right, and actually that's why one of the reasons we asked for expedited arbitration was we could get a quick decision and to hold the transfer in abeyance. The company chose not to do that. That's why we needed to go to court. On one hand, the district court's a genius. On the other hand, sometimes they're not. They're supposed to look at that. They looked at that. They looked at the facts, right? The district court did that. We would say the district court looked at the realities of the situation and determined that the harm was greater for the union than it was for the company. Isn't that just displacing the collective bargaining and grievance process? Because what you suggested is a very wide-open rule, which is that any time a district judge feels that the arbitral process is, in some way, going to be insufficient or whatever, the district court can jump in and make it all right. And that is so contrary to what was bargained for here because I can imagine district judges all over the country saying, no, this arbitral remedy is sufficient. This arbitral remedy is not, thinking, well, the arbitrator could do this or the arbitrator's likely to do that, and so can get out ahead of the arbitrator and forecast arbitral outcomes without ever having the benefit of seeing what the arbitrator might actually do. And it is just this. This is a, under these facts and circumstances, it is a prescription for a much wider incidence of interference. Judge Wilkinson, I disagree with that, and here's why. I didn't expect you to agree with me. You're saying that a judge, the court, could just make it all right. That's not what the district court did. That's not what the exception is for. It's not to make it right. It's to put a stop, to hit the pause button, because when the court recognizes that if we're going to have an arbitration process and part of that process is put these people back to work and put these positions back, you're not going to be able to do that. So, great, the union wins an arbitration a year from now. And I turn around to my members and I say, you're still diminished by 20%. The point is, what did the parties bargain for? They bargained for arbitration and not litigation. Yes, Your Honor, and we're not litigating this. This is litigation. Your Honor, all we're litigating is the propriety of the injunction, which Chief Judge recognized is an exception to the Norris-Guardia Act, and the Fourth Circuit has made specifically clear in both Lever Brothers and Aker what that standard is, and the district court got it right. He applied. I have a question about what the court said in Lever Brothers. It's about this, I'm still confused about this likelihood of success on the merits thing. Is it also your position that the district court needs to kind of take a little quick peek at the merits of the dispute that would go to arbitration before issuing one of these injunctions to make sure there's, like, a real dispute there? Sure, it's a fine line that the district court has to walk because, as I said, district court doesn't want to put its thumb on the scale, right? But what Airgas suggests is that the district judge here didn't take a peek, didn't recognize that there was a genuine dispute in the contract with respect to the contract. We would suggest that he did exactly that. He led off his opinion by stating there are three articles that this case has to do with, Article 9, which was management rights, Article 10, which was the transfer provision, and Article 18, which was the arbitration and grievance process. He led off his decision with that. At the lower court's hearing, I suggested that this case had to do with a dispute between, can we transfer this work or can't we? We're relying on Article 10. The company's relying on Article 9. The court said, yes, we recognize that. Both looking at the collective bargaining agreement and the different articles and looking at whether this remedy is sufficient or whether this remedy might not be, we're well on our way to installing district courts as super arbitrators. That's where this journey ends. Judge, again, I have to disagree with you. It is not easy to limit this case. It's very easy, and what happened here was if you're a super arbitrator, if you're deciding whether or not the company can transfer the work, and that's not what you're deciding to do, you're just deciding whether the district court was correct in issuing an injunction until the arbitration award is issued. Now, we've already presented this to the arbitrator. I presented it on behalf of the union, and we made exactly the argument that you don't have to make, Judge. We made the argument this subcontracting provision, Article 10, applies because it's a work transfer. It's a work preservation. The company made the exact opposite argument, but that's happened outside of the court. And the district court's concern was… It was exactly the arguments that are going to be made before the arbitration. They've already been made. We're waiting a decision. But while we're waiting a decision, as the Chief Judge said, time is ticking by and positions are going. You can't sit back as a union member. You can't sit on your hands and say, geez, I hope the arbitration decision goes my way so I can get my job back. And it's not only that, Your Honor. It's the union was diminished by 20%. The bargaining unit. And you hear the company's points are saying, well, even if we can't make everyone whole, we'll just write a check. We'll just pay off some money and what we call people when there's openings. That still diminishes the bargaining unit. They're tacitly recognizing that maybe there's not a possibility that we can make this all whole. So we'll just write a check. The problem is you're putting the company's business judgment into deep freeze during the pendency of this process. During a pendency of the process that they agree to. They agree to an arbitration process. It would be a hollow formality if the company could say. Is there any interim relief that you can get from the arbitrator? No, Your Honor. That's why we. You can ask for expedition from the arbitrator, giving them the very arguments you've just made to me. But you know what, Your Honor? What the arbitrator is going to say is unless the other side agrees to that, I have no authority to do anything. And that's why we went to the district court. It just bothers me that we have an act of Congress designed to keep courts out of this business. And then, oh, no, when it becomes, you know, pro-labor rather than pro-management, the positions just flip. And one wonders, you know, where is a neutral principle in all of this? Well, Your Honor, I respectfully disagree. And what we're dealing here is not with the federal statute. We're dealing with the Boys Market exception. And it is a limited exception. And the district court recognized that and applied it correctly to these facts. And based on that. Sometimes when you hear the word exception, you hear, you know, courts are writing in an exception. There's no exception. That's not what happened here, Your Honor. The court followed Fourth Circuit precedent and applied that precedent to the facts of this case. That's a matter of statute. Okay. I have nothing further. We'd ask that the district court affirm the lower court. I'm sorry. Excuse me. The appellate court affirm the district court's decision. Thank you. Thank you, Mr. Murphy. Mr. Stillman, you have some time reserved. Thank you, Your Honor. I have three points. One that I believe is responsive to each of the concerns Your Honor has brought up during my friend on the other side's arguments. To begin with where we just left off, Judge Wilkinson. To be clear, this is, in fact, a judicially crafted exception by the Supreme Court to the Norris-LaGuardia Act. So it is, in fact, which does not say it's illegitimate, of course. The Supreme Court passed it down. But we're not dealing with a statutory exception to interpret here. It is something that both the Supreme Court and this Court have stated is a very narrow exception. Yeah, and when you have a judicially crafted exception as opposed to any kind of statutorily crafted exception, you better be very, very careful with it because it's just not the way, you know, if this was an exception that Congress had crafted, then that would be one thing. But it's not. This Court has described the circumstances required here as compelling circumstances for this narrow exception to be able to attach. And to give a little more context about Airgas and the scale that we're discussing here, Airgas is a company with 18,000 employees at 1,100 different locations across the United States. In terms of its ability to be able to respond to, for example, a favorable arbitral order to the union, we would be fully capable, as my friend on the other side conceded before the district court at page 170 of the joint appendix, there is no reason why an arbitrator could not order us to repatriate our planned move from Linthicum Heights and Montgomeryville back to Hyattsville. Simply none. None whatsoever. Because that is the case, if I understand my friend on the other side correctly, we're only inquiring whether or not the arbitrator actually could issue such an order. They have the power to do so. There's nothing in the record that suggests, for example, that we would be insolvent or otherwise noncompliant with the order. That's the beginning and the end of the Boyce-Markets Inquiry. To respond to a question by you, Judge Harris, regarding the merits peak required by this Court, if I understood my friend on the other side's response that, in fact, the district court did create such a peak, that's in stark contrast to what they argued on pages 26 and 27 of their merits brief, where they said the district court correctly withheld that merits peak in the first place. And I agree with you. It's only a threshold showing precisely because, as this Court has directed repeatedly in the past, this Court ought to essentially defer to the arbitrator who is entitled to make these determinations in the first place. So when the company concedes there's an arbitrable dispute here, that's not enough to say, well, that must mean there's something to actually bring to the arbitrator? No, Your Honor. It's a two-part test for the merits showing. The first, we, of course, concede this is an arbitrable issue. The second part is that, in fact, the union provides essentially an argument good enough to show this isn't a sham, that this is a genuine dispute. That's the language this Court has used, a genuine dispute. What does the first part mean, that it's an arbitrable issue, just that? That we agree that it is covered by the contract, that the dispute that's been envisioned is, in fact, something that's required to be arbitrated by the contract. So, for example — It might be purely frivolous. Exactly. So you can envision a situation where there's a genuine dispute, but it's a genuine dispute about something that the parties have not negotiated to arbitrate. So the parties — right, exactly. So the two pieces are somewhat distinct. And, again, my friend on the other side, before the district court in his briefs here, argued specifically there was no need for that second threshold merit showing. I do find it very confusing, and I understand we have that sentence in that Lever brothers' opinion. But, I mean, given that it is reserved to the arbitrator, it is odd to have judges sort of taking a little look just to see how we think it lines up. Right? It's confusing. I agree it's in somewhat modest tension, Your Honor, and that's part of the reason why it's a low threshold, because to have the alternative would be that for the merit showing, the preliminary injunction inquiry, essentially any statement by one side or the other seeking an injunction would suffice. That's the reason. It's supposed to be able to act as a filter for, essentially, low-quality arguments that are on their face, incredibly implausible to be accepted by an arbitrator, which is why district courts are required to make that threshold modest showing. The last point I'd like to make to speak to your concern, Chief Judge Gregory, specifically regarding irreparable harm, which is a distinct inquiry from the irreversibility of voice markets, but in this case they sound similar, is specifically that job losses and unemployment and the consequences from that are, of course, serious human issues. But the Supreme Court in Sampson v. Murray has stated that as a general rule, they do not suffice as an irreparable harm in the injunction inquiry. And as Airgas has conceded below and here, we are both able and willing to reinstate everyone that would have been discharged as a consequence and pay them back pay entirely. Those are powers enjoyed by the arbitrator. Whether the arbitrator in his discretion chooses to exercise one or both or some additional remedy or something we haven't yet contemplated here, it's frankly a matter for the arbitrator's discretion. But the arbitrator has the power to order those harms, not just through money. And my friend on the other side respectfully simply misstated our position. We've never said, may I have leave to finish my sentence, Your Honor? Yes, I want to follow up. When would this as judicially created exception occur then appropriately? I'm sorry, Your Honor, I didn't understand. When would it be appropriate to have an injunction then if you can, as you say, the company can buy their way to the status quo ante? Well, Your Honor, to clarify, I believe the fact that we in fact are also able to reinstate and the arbitrator has the power to reinstate. But to give you an example, for example, in Lever Brothers, a company and union had negotiated specifically for a procedural right to be heard out by a company before a company engaged in prohibited subcontracting and did not negotiate for that right specifically regarding an elimination of jobs. You could quantify that. You could pay damages for having lost that right. I mean, you quantify everything for damages purposes. If it's enough for the company to be able to pull out its checkbook and say, it's not going to be exactly status quo, but we can make you whole with money, why wouldn't that have applied there? Well, two points, Your Honor. First, this is supposed to be a very narrow exception. So I agree there are not terribly large number of circumstances where it applies. But second, as this Court glossed on Lever Brothers in Acres, the right itself to be heard out prior to management making a decision is one of those things that's essentially a fiction or a farce. No one, I don't believe either in Lever Brothers or in Acres, that this Court thinks that that sort of a right to be heard out before a decision has been made can in fact be quantified with money. And to be perfectly candid, Your Honor, I can't think of how one would quantify that decision with money in the first place. And you would figure out sort of what followed, what was the loss, because you didn't have a chance to try to talk them out of doing it, and then say, okay, but for your loss of the procedural opportunity, this wouldn't have happened, we will now pay you damages for this thing that happened. Well, first, Your Honor, and then may I finish responding to this? I don't want to trench too much. Because I also am a little concerned about sort of where the limit of your argument is. Of course, Your Honor. So first, in order to have done that calculation just on the procedural right, then there was a second component of Lever Brothers I'd like to turn to very quickly. On that procedural right, even in order to quantify as you're describing, we would have known the ex ante change in position for management's decision if it had never made the decision beforehand and the union had been able to make a presentation with the knowledge and position it had ex ante before the decision was made at all. I'm confident that district courts make many very difficult decisions constantly, but that strikes me as so profoundly counterfactual that it's essentially entirely fictional that we'd be making up a number. And that's one of the reasons why you might take a right such as that and say that to dispose of it in the first place, functionally irreversible. Once it's gone, you're not going to be able to get it back in any meaningful sense. Our position certainly is not that that right could have been just resolved through money. So let me ask you this. My great concern is that these requests for injunctions are going inevitably to be drawing district courts into assessments of the merits of the eventual arbitration, number one, and assessments of the adequacy of the arbitral remedy. They're sucking into litigation the very matters that an arbitrator is supposed to decide, both on the merits end of it and also on the remedial end of it. And there's nothing, if there was something exceptional about this case where the parties had bargained for this kind of intervention, well, that's okay. But that wasn't present here. And these cases inevitably are going to just add another chef in the kitchen, and both as to the merits and as to remedies. And there isn't anything close in the collective bargaining agreement that permits that. May I respond very briefly? Just say I agree, and I think that's it, right? Well, maybe not. I'll say I agree, Your Honor, and also such a provision which stops the clock in between the decision and the arbitration is something that unions sometimes negotiate for but wasn't negotiated for here. All right. Thank you, Your Honor. Thank you. We'll come down to Greek Council and proceed to our last case for the day.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Pamela A. Harris